UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


JOSEPH DUKES                                          CIVIL ACTION

v.                                                   NO. 15-4948

ZAFIRO MARINE, ET AL.                                SECTION "F"


<u>ORDER AND REASONS</u>

Before the Court is BP Exploration & Production Inc.'s motion for summary judgment. For the reasons that follow, the motion is GRANTED.


**Background**

This litigation arises from personal injuries allegedly suffered by the plaintiff when he rolled his ankle climbing down a three-rung ladder from his upper bunk located in living quarters on a vessel.

In September 2014, Joseph Dukes was employed as an Instrumentation and Electrical (I&E) technician by MMR Contractors, Inc. (MMR) on BP Exploration & Production Inc.'s Thunder Horse, an offshore installation in the Gulf of Mexico, just south of Louisiana. I&E technicians worked 12-hour shifts on

the Thunder Horse and spent the remaining 12 hours of the day on the M/V SAMPSON, a large quarters vessel located near the Thunder Horse. CVI Global Lux Oil and Gas 4 S.a.r.l. was or is the registered owner of the SAMPSON, which BP had time chartered from a company called Harkand Gulf Contracting, LTD.

The SAMPSON was time chartered to BP pursuant to a contract between BP and Harkand entitled Contract for Accommodation Vessel for Global Projects Organization – Gulf of Mexico. The Contract provides that the operation, care, and maintenance of the vessel and the equipment on the vessel were the exclusive obligation of Harkand: "CONTRACTOR [Harkand] shall be wholly responsible for the proper navigation, operation, care and maintenance of all VESSELS and associated PLANT." Harkand was also solely responsible for ensuring that the SAMPSON remained in class, was fully certified for services performed, that the vessel conformed to all relevant legislation, and that the vessel was manned in compliance with all regulations. Among other things, the Contract specifically provides that Harkand "shall ensure adequate provision and maintenance of PLANT, including: ...a) Accommodation."

Another contract entitled a Bridging Document also governed the BP-Harkand relationship. The Bridging Document specified transfer personnel procedures once the SAMPSON was within 500

meters of the Thunder Horse and the SAMPSON approach directives. The Bridging Document obliges BP to provide three SAMPSON-specific support positions to be present on the SAMPSON during overall project operations: (1) a BP Company Vessel Representative (CVR); (2) BP Flotel Personnel on Board Coordinator (POB); and (3) a BP Marine Representative. The BP CVR was the "single point-of-contact" for SAMPSON operations and one of the CVR's express duties was to "assist with room assignments" on the SAMPSON. One of the POB Coordinator's responsibilities was for "bunk allocation."

These contractual provisions were executed in accordance with the contracts. Dukes testified that a "BP Company Man" made the room assignments on the SAMPSON. Dukes's bunk -- the upper bunk with one bunk below it -- was one of over 200 bunks. It had a three-rung ladder attached to the frame of the top bunk by metal "L" shaped brackets. Dukes slept in this same upper bunk and used the same ladder for at least six days until the incident that forms the basis of this lawsuit occurred.

On September 14, 2014, at approximately 4:30 a.m.,[1] when Dukes was climbing down from his upper bunk, he placed his right foot on the top rung of the ladder, but the ladder slid "no more than two

---

[1] At this time, Dukes was working his second 14 on/7 off hitch; he worked the day shift and slept at night on the SAMPSON.

or three inches" along the upper bunk framing to which it was attached. This sliding[2] allegedly caused him to twist his right ankle, lose his balance, and fall to the floor. Dukes then "got up [and] walked it off," took a shower, "got my boots on, laced them up tight, [and] went to work" at 6:00 a.m.

Dukes worked a full day aboard the Thunder Horse and returned to the SAMPSON that night. He says he advised the BP Company Man on the morning of his fall that he had twisted his ankle in his room, but he did not specifically tell him about having slipped on the ladder. Later that afternoon following his hitch, Dukes spoke with the BP Company Man, who offered Dukes the medic's room to sleep in that night, which had an available lower bunk. Dukes changed rooms.

When he woke up the next morning, Dukes says his ankle was swollen and that he could not work. He was treated by the SAMPSON's medic, completed two incident reports, then at his request he was taken by helicopter for medical treatment. In one report, Dukes described what happened to his ankle: "climbing out of top bunk when right foot rolled." In the other report, Dukes wrote:

On Saturday morning 9-14-14 @ 4:30 AM I was climbing down from my bunk in room 107 when my right foot rolled

---

[2] There was no movement of the vessel or any rough seas that caused this.

> or twisted on me.  I walked around the room for a minute
> then got dressed and went to work.  After work I cleaned
> up and went to bed. On the morning of the 15th I could
> not put much pressure on my right foot, went to medic
> and he wrapped my foot with bandage.

Dukes made no reference to any fall in either report.  Nor did he suggest that the ladder had moved.  He now says he fell and, as a consequence of his fall, he alleges that he injured not only his ankle, but has since suffered additional latent injuries to his left hip, lower back, and left shoulder.

On October 2, 2015, Dukes sued Zafiro Marine, alleging that Zafiro's negligence and the unseaworthiness of the SAMPSON caused his ankle, leg, hip, and back injuries.  Dukes later added BP Exploration & Production, Inc. as a defendant, alleging that BP controlled Zafiro Marine's work pursuant to a contract and that BP's negligence, in addition to Zafiro Marine's negligence and the SAMPSON's unseaworthiness, caused his injuries.  Dukes has amended his complaint several times in an attempt to name the correct owner of the SAMPSON:  Zafiro was replaced with ZM Industries Limited, which was later replaced with CVI Global Lux Oil and Gas, which is a non-existent entity.  CVI Global Lux Oil and Gas 4 S.a.r.l. has since appeared as the registered owner of the SAMPSON; it allege in its answer that it has owned the vessel "at various times."  Finally, Zurich American Insurance Company intervened in this

litigation, alleging that it issued to MMR a workers' compensation and employer liability policy, that it paid worker's compensation benefits to plaintiff pursuant to the policy and Louisiana law, and that it is entitled to recover all compensation and medical expenses paid or to be paid and is entitled to a credit for future medical benefits for compensation that may be paid to Dukes.

Disclaiming responsibility for the SAMPSON's seaworthiness or the safety of its living quarters, BP now moves for summary judgment dismissing the plaintiff's claims against it.

I.

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine dispute as to any material fact such that the moving party is entitled to judgment as a matter of law. No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A genuine dispute of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. See id. Ultimately, "[i]f

the evidence is merely colorable . . . or is not significantly probative," summary judgment is appropriate. Id. at 249 (citations omitted); see also Hathaway v. Bazany, 507 F.3d 312, 319 (5th Cir. 2007)(internal quotation marks and citation omitted) ("[T]he nonmoving party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.").

Summary judgment is also proper if the party opposing the motion fails to establish an essential element of a claim. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In this regard, the non-moving party must adduce competent evidence, including but not limited to sworn affidavits and depositions, to buttress his claims. See Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 649 (5th Cir. 1992). However, affidavits or pleadings which contradict earlier deposition testimony cannot create a genuine issue of material fact sufficient to preclude an entry of summary judgment. See S.W.S. Erectors, Inc. v. Infax, Inc., 72 F.3d 489, 495 (5th Cir. 1996); Thurman v. Sears, Roebuck & Co., 952 F.2d 128, 137 n. 23 (5th Cir. 1992).

In deciding whether a fact issue exists, courts must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007)

(citations omitted). Although the Court must "resolve factual controversies in favor of the nonmoving party," it must do so "only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." Antoine v. First Student, Inc., 713 F.3d 824, 830 (5th Cir. 2013)(internal quotation marks and citation omitted).

"If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition," the Court may issue any appropriate order, such as an order deferring consideration of the motion or denying it, or allowing additional time for discovery. Fed. R. Civ. P. 56(d). As another Section of this Court recently summarized requests for additional time for discovery under Rule 56(d):

> [Rule 56(d)] permits a district court to deny or defer consideration of a motion for summary judgment, allow time to take discovery, or "issue any other appropriate order" when "a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). Nonetheless, the party seeking a continuance "may not simply rely on vague assertions that additional discovery will produce needed, but unspecified, facts." Raby v. Livingston, 600 F.3d 552, 561 (5th Cir. 2010)(quoting Sec. & Exch. Comm'n v. Spence & Green Chem. Co., 612 F.2d 896, 901 (5th Cir. 1980)). Instead, the party seeking to continue a motion for summary judgment to obtain further discovery must demonstrate (1) "why he needs additional discovery" and (2) "how the additional discovery will create a genuine issue of material fact." Krim v. BancTexas Grp., Inc., 989 F.2d 1435, 1442 (5th Cir. 1993). In other words,

> the plaintiff must identify specific facts, susceptible
> of collection, and indicate how those facts "'will
> influence the outcome of the pending summary judgment
> motion.'" <u>McKay v. Novartis Pharm. Corp.</u>, 751 F.3d 694,
> 700 (5th Cir. 2014)(quoting <u>Raby</u>, 600 F.3d at 561).

<u>Menard v. LLOG Exploration Co., LLC</u>, No. 16-498, 2017 WL 1317568,

at *2 (E.D. La. Apr. 10, 2017)(Vance, J.).

II.

*A.*

BP submits that it is entitled to judgment as a matter of law dismissing the plaintiff's claims against it because, as it merely time chartered the vessel, BP owed no duty to the plaintiff with respect to the safety of his room or the bunk ladder. BP submits that, consistent with the contractual provisions governing their relationship, all responsibility for the condition of the bunk was vested with Harkand and none with BP. BP submits that there is no genuine dispute that, as time charterer, it did not control the physical operation of the SAMPSON, nor was it responsible for the safety or seaworthiness of the vessel. Dukes counters that BP assumed a duty regarding the safety of the rooms by staffing a company man on board, who assigned the rooms and told Dukes to come to him for "anything that had to do with" the vessel. Because Dukes fails to identify a genuine dispute as to a material fact concerning BP's liability, BP is entitled to judgment as a matter of law.

Because Dukes is an Outer Continental Shelf worker, the Longshore & Harbor Workers Compensation Act, through the Outer Continental Shelf Lands Act, governs liability for his alleged injuries. Section 905(b), the exclusive remedy for offshore workers, provides:

> In the event of injury to a person covered under this Act caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 33 of this Act.... The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this Act.

33 U.S.C. § 905(b). While the definition of a "vessel" under the LHWCA includes "time charterers," a time charterer's liability is more limited than the liability of an owner or demise charterer. Hudson v. Schlumberger Tech. Corp., 452 Fed.Appx. 528, 536 (5th Cir. 2011); Kerr-McGee Corp. v. Ma-Ju Marine Servs., Inc., 830 F.2d 1332, 1338-39, 1343 (5th Cir. 1987).

"In a time charter the vessel owner retains possession and control of the vessel; provides whatever crew is needed and is responsible for normal operating expenses. Further, in a time charter the owner fully equips and maintains the vessel, makes

repairs as needed and provides insurance on the vessel." Walker
v. Braus, 995 F.2d 77, 81 (5th Cir. 1993).  Thus, in a time charter
arrangement, the vessel owner remains responsible for its vessel's
seaworthiness, dangerous conditions on board, pilot navigational
errors, crew negligence, and a reasonably safe means of ingress
and egress for those boarding or leaving the vessel.  Moore v.
Philips Petroleum Co., 912 F.2d 789 (5th Cir. 1990)(internal
citations omitted).  Given this arrangement, a time charterer is
generally not liable for crew negligence or vessel
unseaworthiness.  See Forrester v. Ocean Marine Indem. Co., 11
F.3d 1213, 1215 (5th Cir. 1993).  But a time charter may be liable
for its own negligence in its capacity as a time charterer where
the harm occurs "within the charterer's traditional sphere of
control and responsibility or has been transferred [to the
charterer] by the clear language of the charter agreement." Kerr-
McGee Corp., 830 F.2d at 1339-43; Hodgen v. Forest Oil Corp., 87
F.3d 1512, 120 (5th Cir. 1996)(a time charter's duty is to "avoid
negligent actions within the sphere of activity over which it
exercises at least partial control."), overruled on other grounds
by, Grand Isle Shipyard, Inc. v. Seacor Marine, LLC, 589 F.3d 778
(5th Cir. 2009).  The "spheres of activity" in which a time
charterer has control include "choosing the vessel's cargo, route,

and general mission, as well as the specific time in which the vessel will perform its assignment." Hodgen, 87 F.3d at 1520.

Here, the BP-Harkand Contract confirms the traditional allocation of responsibility of the seaworthiness of the vessel to Harkand. The Contract provides that the operation, care, and maintenance of the vessel and the equipment on the vessel were the exclusive obligation of Harkand: "CONTRACTOR [Harkand] shall be wholly responsible for the proper navigation, operation, care and maintenance of all VESSELS and associated PLANT."[3] Among other things, the Contract specifically provides that Harkand "shall ensure adequate provision and maintenance of PLANT, including: ...a) Accommodation." Consistent with BP's more limited sphere of responsibility, the BP-Harkand Bridging Document provided that BP staff the SAMPSON with certain support positions, including representatives who were responsible for directing room assignments and bunk allocation.

Nothing in the BP-Harkand Contract or Bridge Document reflects the parties' intent to shift from Harkand to time charterer, BP, responsibilities for such things as vessel

---

[3] "PLANT" is defined as "all materials, machinery, apparatus, supplies, property and equipment (including all VESSELS), which is owned, leased, rented, chartered or operated by CONTRACTOR GROUP...." And, "VESSEL" was defined to include the SAMPSON.

seaworthiness that would alter the traditional sphere of control and responsibility sufficient to shift liability. To the contrary, the relevant provisions of these agreements indicate that operational responsibility, as well as care and maintenance of the SAMPSON, was vested with Harkand. The relevant contracts are unambiguous and expressly provide that Harkand is responsible for the condition of the vessel and explicitly requires Harkand to maintain the accommodation facilities. To be sure, the agreements contain no "clear statement" that the charter parties intended to shift responsibility for vessel unseaworthiness or vessel crew negligence to the charterer. See Kerr-McGee Corp., 830 F.2d at 1339-43. Because the contracts do not alter BP's traditional limited sphere of control as time charterer, it cannot be held accountable for Dukes's accident.

Hudson v. Schlumberger Tech. Corp. reinforces this result. BP submits that its contract with Harkand is similar to the BP-Alpha contract in Hudson because it vests responsibility for maintenance of the accommodations and safety on Harkand, not BP. The Court agrees. In Hudson, the plaintiff sued his employer, the vessel owner, and the time charterer, BP, for damages arising out of injuries he suffered when he stepped in an uncovered "pad-eye" hole while performing seismic activities on board the M/V C-COMMANDER. 452 Fed.Appx. 528, 536 (5th Cir. 2011). The vessel

was owned and operated by Alpha. BP, the time charterer, had a representative on the vessel with the right to view inspections of the vessel by the owner, but the time charter did not provide that BP was responsible for the maintenance of the vessel and BP did not in any practical way exercise control over the maintenance of the vessel; accordingly, the Fifth Circuit held that BP as time charterer was not liable for the plaintiff's injuries. <u>Id.</u> (affirming the district court's grant of summary judgment in favor of BP because BP was not responsible for maintaining the safety of the vessel's aft deck, either by custom or agreement, and the plaintiff had no Section 905(b) claim against BP as a matter of law). Given the similarities, the outcome in <u>Hudson</u> dictates the same result here. Although BP had a company representative on board, there is no record evidence indicating that the company representative exercised any control over the maintenance of the bunk beds; nor does the contract give that responsibility to BP. That responsibility remained with Harkand.[4]  As a matter of law, BP is not liable under § 905(b) for Dukes's injuries alleged here.

---

[4] Here, the Contract provides that Harkand, not BP, has responsibility for the safety of the work.  And, like in <u>Hudson</u>, Harkand ensured the quality of the work.  The BP-Harkand Contract also states that it is the owner's responsibility to carry out tests and inspections; BP merely has the right to witness any inspection.  BP had the right to audit the vessels, but the charter contract did not require it to do so.  Most notably, it was

Dukes fails to point to any provision of the parties' agreements that demonstrates an intent by the parties to alter the typical allocation of charter responsibilities such that BP was obliged to maintain the accommodations on the SAMPSON and should be held liable for Dukes's injuries. Indeed, the only evidence offered by the plaintiff, his own deposition testimony, confirms that BP acted in accordance with its limited contractual duties as time charterer. Dukes testified that BP did not operate the SAMPSON vessel. He testified that he thinks, in hindsight, that his room was unsafe,[5] but he agreed that BP did not design the bunk

---

Harkand's responsibility to undertake the maintenance of the vessel and to ensure it was fit for service.

[5] Nevertheless, Dukes testified that there was nothing unsafe about his bunk at the time of the incident:

Q: Is it fair to say it's your testimony that you believe the room was unsafe?

A: Looking back now, yes.

Q: Looking back now in hindsight it was unsafe?

A: Yes.

Q: At the time, up until your incident, did you have any reason to believe the room was unsafe?

A: No.

Q: Okay. And tell me if I'm being inaccurate. It's your testimony that you fault BP for not making sure that the SAMPSON people had a room that was safe enough?

A: Right, Yes.

or its ladder. When asked to link his injury to BP's conduct,
Dukes testified:

> I feel it was BP's responsibility to make sure that
> whatever [the] SAMPSON had on that boat was safe for me
> to be in. BP felt the need to have a member of their
> employment on the boat at all times that took charge of
> everybody coming on the boat and where they slept, what
> time they – you know, when they were supposed to meet
> for their transfers. BP man handled all of that. So I
> feel that BP is the reason they didn't do – as far as
> the rooms go, when they put us in that situation of BP
> wasn't going do somehow take some type of, I guess
> responsibility, say these rooms are safe for everybody,
> there are no issues or anything.

In other words, Dukes's theory of BP's liability is anchored
in the fact that the contracts required, and his experience showed,
that a BP company man was on board and responsible for making room
and bunk assignments. But this is insufficient to demonstrate
that BP exceeded its traditional time charterer role and assumed
liability for the safety conditions of the vessel. Dukes's
testimony does not indicate that the BP company representative
inspected or controlled the quality of the bunks; his testimony
indicates that the BP company man was merely on board to deal with
personnel issues. Dukes's theory of liability fails as a matter
of law. Simply having a representative of a charterer on board
does not shift operational responsibility or liability to the
charterer. See Forrester, 11 F.3d at 1217 (when a time charterer

has on board an employee who gives general safety instructions, that is insufficient to prove that a time charterer exceeded its traditional role and assumed liability for the safety conditions of the vessel); see also Roby v. Hyundai Marine, 700 F. Supp. at 323 (contractual language authorizing a charterer to appoint a cargo supervisor was not clear language that the charter party intended to shift operational control of the cargo loading and unloading to the time charterer).

*C.*

1.  There Is No Evidence in the Record that Supports a General Maritime Negligence Claim.

Dukes admits that BP did not operate the SAMPSON; that BP was not contractually responsible for cleaning the bunks or rooms on the SAMPSON; that BP was not contractually responsible for ensuring that the bunk ladders did not slide or move. Nevertheless, Dukes attempts to manufacture a factual dispute concerning whether BP assumed a duty to keep workers aboard the SAMPSON safe, a duty he says arises under general maritime law. His attempt fails as a matter of law.

Because a BP company man was present on board and assigned bunks, Dukes's argument goes, "there remain questions about the duties which BP placed on these 'company men,' and the extent of

the company man's role on the M/V SAMPSON." Dukes offers no evidence to support his speculation that perhaps these company men might testify that their duties varied from the relevant contracts; the only evidence he offers actually shows that BP conformed to the limited responsibilities delegated by the time charter and Bridging Document. BP assigned rooms and bunks, as called for by the time charter. There is simply no evidence in the record that would show, or present a genuine dispute regarding, whether BP acted in a way in which a duty was imposed under general maritime law, BP breached the duty, or the injury sustained by Dukes was caused by BP's conduct in assigning rooms and bunks. See In re Great Lakes Dredge & Dock Co., 624 F.3d 201, 211 (5th Cir. 2010). Dukes's suggestion that his testimony alone is sufficient to defeat summary judgment, while true in theory, fails in practice where, as here, his testimony simply confirms BP's submission.

> 2.   Dukes's Vague Request for Additional Discovery Fails
>       Under Rule 56(d).

In a final attempt to avoid summary judgment, Dukes requests additional discovery, which he says is needed to explore the relationship between BP and Harkand. The request, which comprises two paragraphs at the end of his opposition memorandum, is procedurally and substantively flawed and is therefore denied.

18

First, Dukes's request that the Court delay ruling on BP's summary judgment motion is procedurally defective. That the plaintiff failed to include either an affidavit or a declaration in support of the Rule 56(d) request is sufficient grounds to deny the motion. See Scotch v. Letsinger, 593 Fed.Appx. 276, 278 (5th Cir. 2014)("Because Scotch did not submit either an affidavit or a declaration, the district court did not err in denying Scotch's request."); Leza v. City of Laredo, 496 Fed.Appx. 375, 377-78 (5th Cir. 2012)(rejecting the plaintiff's argument that the affidavit requirement is "redundant, inappropriate, and bureaucratic" and affirming denial of Rule 56(d) motion because movant did not present affidavit or declaration); see also Sandusky Wellness Ctr., LLC v. Medco Health Sols., Inc., 788 F.3d 218, 226 (6th Cir. 2015). Here, Dukes fails to submit a sworn statement in support of his request for additional time to complete discovery. His request fails for this reason alone.

Second, his request that the Court defer ruling on BP's motion for summary judgment is substantively defective. Dukes is not entitled to additional discovery to prove his speculative theory that BP may have acted in a way that altered the traditional allocation of responsibility spheres between owner and charterer. Dukes hopes to depose a representative of Harkand to determine "whether BP's position on Harkand's role is also Harkand's

19

understanding of its position." Dukes insists that "there remain questions about the duties which BP placed on [its] 'company men,' and the extent of the company man's role on the M/V SAMPSON." But a non-movant must be diligent in its pursuit of discovery and may not rest on vague allegations that discovery may produce needed but unspecified facts to avoid an otherwise properly supported summary judgment motion. See Beattie v. Madison County Sch. Dist., 254 F.3d 595, 606 (5th Cir. 2001)(although Rule 56(d) motions are generally favored, the nonmoving party must show that he has diligently pursued discovery, as well as show why he needs additional discovery and how the additional discovery will create a genuine issue of material fact). Here, Dukes fails to explain why he had not previously obtained the discovery he now seeks.[6]

---

[6] This case was filed in October 2015. The original trial date was continued just last month upon joint request by the parties because the plaintiff had not yet reached Maximum Medical Improvement. Why significant discovery progress was not made under the original scheduling order is not explained. The plaintiff simply suggests that it only recently received the relevant contracts and the identity of the BP company men, who are not currently employed by the defendants and have not responded to requests for depositions. The plaintiff offers no explanation as to why he did not pursue the discovery he now seeks within the deadlines fashioned by the initial scheduling order. Notably, Dukes was asked in his deposition on November 30, 2016 about the documents he claims he just received, and he was specifically asked about Harkand, a company he now says "may even need to be added as a defendant" if Harkand representatives are deposed and testify consistently with BP's submission here. This suggests that the plaintiff has not been diligent in seeking discovery and is no reason to delay in ruling on BP's motion for summary judgment.

And, more critically, he fails to show how the additional discovery is not simply a fishing expedition, but, rather, will create a genuine issue of material fact. He merely says that the BP company men need to be deposed, as does a Harkand representative, to determine whether they will testify that they conducted themselves consistently with the terms of the relevant contracts. The summary judgment rules do not countenance delay tactics based on nothing more than hope that the evidence one did not diligently pursue may uncover evidence to support a claim.[7]

Accordingly, BP's motion for summary judgment is GRANTED. The plaintiff's claims against BP are hereby dismissed.

New Orleans, Louisiana, April 27, 2017

_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE

---

[7] "Rule 56(d) 'does not condone a fishing expedition where a plaintiff merely hopes to uncover some possible evidence of [value].'" Menard, 2017 WL 1317568, at *2 (citing Duffy v. Wolle, 123 F.3d 1026, 1041 (8th Cir. 1997) and Jason v. Parish of Plaquemines, No. 16-2728, 2016 WL 4623050, at *4-5 (E.D. La. Sept. 6, 2016)(denying plaintiff's request to defer consideration of motion for summary judgment because the plaintiff gave "nothing more than a 'speculative hope' that discovery might provide plaintiff with information supporting his claims")(quotation omitted)).