UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JOSEPH DUKES                                         CIVIL ACTION

VERSUS                                               NO. 15-4948

ZAFIRO MARINE                                        SECTION M (3)


**ORDER & REASONS**

Before the Court is a motion *in limine* to exclude the expert testimony of Steve Nolte ("Nolte") filed by defendant CVI Global Lux Oil and Gas 4 S.a.r.l. ("CVI"),[1] to which plaintiff Joseph Dukes ("Dukes") responds in opposition.[2] Having considered the parties' memoranda and the applicable law, the Court issues this Order & Reasons.

I.     BACKGROUND

This litigation arises from personal injuries allegedly sustained by Dukes when he rolled his ankle climbing down a three-rung ladder from his upper bunk located in the living quarters of a vessel.[3] In September 2014, Dukes was employed by MMR Contractors, Inc. "(MMR") as an instrumentation and electrical technician and working on the *Thunder Horse*, an offshore platform in the Gulf of Mexico off of the Louisiana coast that was owned by BP Exploration & Production Inc. ("BP").[4] Dukes worked twelve-hour shifts on the *Thunder Horse*, and spent the other twelve hours of the day on the M/V *Sampson*, a large quarters vessel located near the *Thunder Horse* that was owned by CVI and time chartered by BP from Harkand Gulf Contracting, Ltd. ("Harkand").[5] Dukes worked the day shift and slept on the M/V *Sampson* at night.[6]

---

[1] R. Doc. 94.
[2] R. Doc. 99.
[3] R. Doc. 48 at 1.
[4] *Id.*
[5] *Id.* at 1-2.
[6] *Id.* at 3 n.1.

Dukes was assigned to an upper bunk on the M/V *Sampson*.[7] The bunk had a three-rung ladder attached to the frame of the top bunk by metal "L"-shaped brackets.[8] On September 14, 2014, when Dukes was climbing down from his upper bunk, he placed his right foot on the top rung of the ladder, but the ladder slid "no more than two or three inches" along the upper bunk framing to which it was attached, causing Dukes to twist his right ankle, lose his balance, and fall to the floor.[9] Dukes walked it off, took a shower, got dressed, and went to work at 6:00 a.m.[10] Dukes slept in the same upper bunk and used the same ladder for at least the six days leading up to the incident at issue.[11]

Dukes claims that, on the morning of the accident, he advised the BP Company Man that he twisted his ankle, but he did not specifically mention that he slipped on the ladder.[12] When he returned to the M/V *Sampson* after work on September 14, 2014, Dukes spoke with the BP Company Man, who offered Dukes a lower bunk in the medic's room for that night, and Dukes accepted.[13]

Dukes claims that, by the morning of September 15, 2014, his ankle was swollen, and he could not work.[14] The M/V *Sampson*'s medic treated Dukes.[15] Dukes completed two incident reports, and then was taken by helicopter for medical treatment, at his request.[16] In one report, Dukes stated that he was "climbing out of the top bunk when right foot rolled."[17] In the other report Dukes wrote:

---

[7] *Id.* at 3.
[8] *Id.*
[9] *Id.* at 3-4.
[10] *Id.* at 4.
[11] *Id.* at 3. Dukes was on his second fourteen-day hitch working on the *Thunder Horse* and sleeping on the M/V *Sampson* when the accident occurred.
[12] *Id.* at 4.
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *Id.*

> On Saturday morning 9-14-14 @ 4:30 AM I was climbing down from my bunk in room 107 when my right foot rolled or twisted on me. I walked around the room for a minute then got dressed and went to work. After work I cleaned up and went to bed. On the morning of the 15th I could not put much pressure on my right foot, went to medic and he wrapped my foot with bandage.[18]

Dukes did not make any reference to a fall or that the ladder had moved in either report.[19] In this lawsuit, Dukes claims that the ladder moved causing him to fall, and as a result of the fall he injured his ankle, left hip, lower back, and left shoulder.[20]

On October 2, 2015, Dukes filed this action naming Zafiro Marine ("Zafiro") as the defendant.[21] Dukes alleged that Zafiro owned, operated, and/or controlled the M/V *Sampson* and that Zafiro's negligence and the unseaworthiness of the vessel caused Dukes' injuries.[22] Throughout the course of this litigation, Dukes has filed four supplemental and amending complaints.[23] In one of the amended complaints, Dukes named BP as a defendant, but the Court granted BP's motion for summary judgment, dismissing Dukes' claims against BP.[24] Further, Dukes amended his complaint several times attempting to name the correct owner of the M/V *Sampson*: Zafiro was replaced with ZM Industries Limited, which was later replaced with CVI Global Lux Oil and Gas, which is a non-existent entity.[25] CVI appeared as the registered owner of the M/V *Sampson*.[26] In his fourth amended and supplemental complaint, Dukes added Harkand as a defendant.[27] Because Harkand has failed to answer or otherwise defend the lawsuit, the Court entered a preliminary default against it.[28] Finally, Zurich American Insurance Company ("Zurich") intervened in the litigation alleging that it issued to MMR a workers' compensation and employer liability insurance policy, that it paid workers' compensation

---

[18] *Id.* at 4-5.
[19] *Id.* at 5.
[20] *Id.*
[21] R. Doc. 1.
[22] *Id.* at 2-3.
[23] *See* R. Docs. 4, 9, 15 & 52.
[24] R. Docs. 4 & 48.
[25] R. Docs. 9 & 15.
[26] R. Doc. 20.
[27] R. Doc. 52.
[28] R. Doc. 79.

benefits to Dukes, and that it is entitled to recover all compensation and medical expenses it paid or will pay to Dukes.[29]

## II. PENDING MOTION

CVI filed the instant motion *in limine* seeking to exclude the testimony of Nolte, Dukes' purported expert in naval architecture, marine engineering, and marine safety.[30] CVI does not challenge Nolte's qualifications, but rather argues that his opinions will not aid the trier of fact because the accident involves issues within a layperson's general understanding – namely, falling off of a bunkbed ladder.[31] CVI also argues that Nolte offers impermissible legal conclusions.[32]

Dukes argues that Nolte's testimony should not be excluded because his expertise in maritime safety will aid the trier of fact in understanding safety standards that are unique to the maritime industry, and generally not within a juror's common knowledge.[33] Dukes contends that laypersons are typically not familiar with maritime industry standards governing the inspection and maintenance of vessels, or the typical requirements for a bunkbed-and-ladder setup on a vessel like the M/V *Sampson*.[34] Dukes argues that CVI's concerns about Nolte's testimony can be addressed through cross-examination and the presentation of testimony from CVI's own maritime safety expert.[35]

## III. LAW & ANALYSIS

A district court has discretion to admit or exclude expert testimony under the Federal Rules of Evidence. *General Elec. Co. v. Joiner*, 522 U.S. 136, 139 (1997). In *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 589 (1993), the Supreme Court held that Rule 702 requires a

---

[29] R. Doc. 28.
[30] R. Doc. 94.
[31] R. Doc. 94-2 at 4-6.
[32] *Id.* at 7-9.
[33] R. Doc. 99 at 7.
[34] *Id.*
[35] *Id.* at 9-10.

district court to act as a gatekeeper to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." Rule 702 of the Federal Rules of Evidence provides:

> A witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product or reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The reliability inquiry requires a court to assess whether the reasoning or methodology underlying the expert's testimony is valid. *See Daubert*, 509 U.S. at 592-93. In *Daubert*, the Supreme Court listed several non-exclusive factors for a court to consider in assessing reliability: (1) whether the theory has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) the general acceptance of the methodology in the scientific community. *Id.* at 593-95. However, a court's evaluation of the reliability of expert testimony is flexible because "[t]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire v. Carmichael*, 526 U.S. 137, 150 (1999). In sum, the district court must ensure "that an expert, whether basing testimony upon professional studies or personal experiences, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. The party offering the testimony must establish its reliability by a preponderance of the evidence. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).

Next, the district court must determine whether the expert's reasoning or methodology "fits" the facts of the case and whether it will assist the trier of fact to understand the evidence, *i.e.*, whether it is relevant. *Daubert*, 508 U.S. at 591. An expert's testimony is not relevant and may be excluded if it is directed at an issue that is "well within the common sense understanding of jurors or requires no expert testimony." *Vogler v. Blackmore*, 352 F.3d 150, 156 (5th Cir. 2003). Further, an expert cannot make "legal conclusions reserved for the court," credit or discredit witness testimony, or "otherwise make factual determinations reserved for the trier of fact." *Highland Capital Mgmt., L.P. v. Bank of Am., N.A.*, 574 F. App'x 486, 491 (5th Cir. 2014).

Rule 702 also requires that an expert be properly qualified. Generally, if there is some reasonable indication of qualifications, the district court may admit the expert's testimony, and then the expert's qualifications become an issue for the trier of fact. *Rushing v. Kan. City S. Ry.*, 185 F.3d 496, 507 (5th Cir. 1999), *superseded in part by statute on other grounds as noted in Mathis v. Exxon Corp.*, 302 F.3d 448, 459 n.16 (5th Cir. 2002). A witness qualified as an expert is not strictly confined to his area or practice, but may testify regarding related applications; a lack of specialization goes to the weight, not the admissibility of the opinion. *Cedar Lodge Plantation, L.L.C. v. CSHV Fairway View I, L.L.C.*, 2018 WL 4932716, at *3 (5th Cir. Oct. 10, 2018) (quotations and citations omitted).

CVI does not contest Nolte's qualifications in the field of marine safety and engineering. Nolte earned a Bachelor of Science degree from the University of New Orleans in naval architecture and marine engineering in 1994.[36] He is a member of the Society of Naval Architects and Marine Engineers, and has over 25 years of experience designing, engineering, maintaining, and operating various types of vessels.[37] Based on his education and experience,

---

[36] R. Doc. 99-2 at 5.
[37] *Id.*

6

Nolte has technical expertise in vessel classification, surveying, design, and management; vessel rules and regulations; and assessment of vessels under international codes and flag state regulations.[38]

In his report, Notle discusses sections of the International Safety Management Code ("ISM"), International Labor Organization ("ILO") regulations, and American Society for Testing Materials ("ASTM") Requirements for Marine Berths, that he opines are applicable to the M/V *Sampson*, and how he believes CVI failed to comply with those rules, regulations, and requirements.[39] Those industry standards, and their application to CVI and the accident in question, are not within the common knowledge of the jurors and therefore constitute admissible expert testimony. To the extent CVI questions the content or application of these industry standards to CVI and the accident, CVI will have an opportunity to explore them through cross-examination of Nolte and the presentation of CVI's retained expert.

Nolte's report also offers several opinions that constitute legal conclusions, or factual determinations that are reserved for the jury, and thus are inadmissible. The following statements in Nolte's report constitute inadmissible legal or factual conclusions:

> It is the opinion of the undersigned that CVI as the owners and operators of the "M/V SAMPSON", their management, safety department, designated person ashore (DPA), vessel group manager (VGM) and captain caused and or contributed to Mr. Dukes' accident and thus were responsible for his injury.[40]

> \*   \*   \*

> The DPA, VGM and captain under the ISM had a duty to provide and maintain a safe vessel for the crew, and persons aboard the vessel, which they failed to do.[41]

> \*   \*   \*

---

[38] *Id.*
[39] *Id.* at 6-11.
[40] *Id.* at 4.
[41] *Id.*

7

A maritime employer under the general maritime regulations has a duty to provide a vessel with a safe working environment which was free from recognized hazards, and also requires that the vessel be reasonably fit to enable the crew to perform their duties with reasonable safety.

A vessel shall be deemed to be unsafe by reason of:

- The defective condition of the hull, machinery or equipment; or

- Failure to provide safe means for access and ingress; or

- Unsafe bunk beds; or

- Failure to properly maintain the vessel and its sea equipment.[42]

\* \* \*

It is the opinion of [Nolte] that the accident which occurred to Mr. Dukes was not his fault.[43]

These above-quoted statements constitute either legal conclusions upon which the Court will instruct the jury, or statements as to the ultimate question of fact regarding fault, which is for the jury to decide. Therefore, Nolte's testimony as to these statements is excluded.

Further, Nolte offers an opinion that the bunkbed was unsafe because it lacked lee rails, which run along the bed to prevent the occupant from falling out while sleeping.[44] Dukes allegedly fell while exiting the top bunk because the ladder moved. Whether the bunkbed had proper lee rails is irrelevant to the facts of this case. Therefore, Nolte's testimony regarding lee rails is excluded.

## IV. CONCLUSION

Accordingly,

IT IS ORDERED that CVI's motion *in limine* to exclude the expert testimony of Nolte is GRANTED as to excluding Nolte's legal conclusions, statements regarding fault, and irrelevant opinions regarding lee rails; the motion is otherwise DENIED.

---

[42] *Id.* at 5-6.
[43] *Id.* at 11.
[44] *Id.* at 4 & 11.

New Orleans, Louisiana, this 14th day of December, 2018.

_____
BARRY W. ASHE
UNITED STATES DISTRICT JUDGE